IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| State Farm Mutual Automobile Insurance Company, | ) ) ) | C/A No. 2:03-3302-18 |
| Plaintiff, | ) ) | |
| vs. | ) ) | **ORDER** |
| Addie Armstrong as Personal Representative of the Estate of Rickey L.Armstrong, | ) ) ) ) | |
| Defendant. | ) ) | |

This matter came before the court on April 25, 2005 for findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. Based on the evidence presented and heard on that date and on the other filings presented to the court in conjunction with this matter, the court makes the following findings of fact and conclusions of law.

**I. Background**[1]

Plaintiff State Farm Mutual Automobile Insurance Company ("plaintiff" or "State Farm") filed the instant action on October 17, 2003 seeking a declaratory judgment pursuant to S.C. Code Ann. § 15-53-10, et seq., referred to as the Declaratory Judgment Act. This court has subject-matter jurisdiction based on diversity of citizenship as granted under 28 U.S.C. § 1332.[2] The sole issue for the court's determination is whether

---

[1] The information in this section is undisputed.

[2] Plaintiff is an insurance company organized and existing under the laws of the State of Illinois. Defendant Rickey L. Armstrong was a citizen and resident of Georgetown County, South Carolina at the time of his death. Addie Armstrong, Personal

defendant Rickey L. Armstrong ("defendant"or "Rickey") was primarily a resident relative of the household of Addie and George Armstrong on the date of his death. Both parties presented witness testimony and evidence in support of their respective positions. At the conclusion of the trial, this court took the matter under advisement and now issues its ruling.

On September 22, 2001, Rickey Armstrong was walking on the shoulder of South Carolina Secondary Road S-22-4, also known as Choppee Road, in Georgetown County, South Carolina when an unknown driver traveling in the same direction struck him from behind, causing injuries that ultimately resulted in his death.[3] Addie Armstrong, Rickey's sister, was appointed as the personal representative of his estate. On the date of Rickey's death, Addie and her husband, George, resided at 107 Cookies Place in Georgetown, South Carolina. As of that same date, a mobile home was located beside 107 Cookies Place and was associated with the address 119 Cookies Place, Georgetown, South Carolina. The parties have agreed and stipulated that if the court determines that Rickey was primarily a resident relative of his sister and brother-in-law at 107 Cookies Place at the time of his death, then as a Class II insured under S.C. Code Ann. § 38-77-160, there are four State Farm automobile liability insurance policies applicable to his survival and wrongful death claims. They have also agreed and stipulated that if Rickey were primarily a resident of 119 Cookies Place at the time of his death, then none of the

---

Representative of defendant's estate, is– and was at all times relevant– also a citizen and resident of Georgetown County, South Carolina.

[3] The driver left the scene of the accident and remains unknown to the parties and the court as of the issuance of this order.

State Farm policies provide coverage under the uninsured motorist provisions of the policies.

## II. Findings of fact and conclusions of law

Upon review of the evidence with due consideration to credibility and circumstance, for the reasons stated below, the court finds that the decedent, Rickey L. Armstrong, was primarily a resident relative of his sister and brother-in-law in 107 Cookies Place on September 22, 2001 and was therefore an insured under the State Farm automobile insurance policies in question.

### A.   The Policies and the general law to be applied

Prior to trial, the parties stipulated that four insurance policies issued to George and Addie Armstrong provide coverage if the court finds that Rickey Armstrong was primarily a resident relative of George and Addie Armstrong's residence at the time of his death (the "Policies").[4] In consideration of the agreement of the parties and an independent reading of the Policies, the court finds relevant the following portions of the State Farm Policies issued to George and Addie Armstrong:

> **SECTION III– UNINSURED MOTOR VEHICLE– COVERAGE U . . .**
>
> . . . .
>
> We will pay damages for **bodily injury** or **property damage** an **insured** is legally entitled to collect from the owner or driver of an **uninsured motor vehicle**. The

---

[4] Three of the insurance polices at issue (numbers 0213-733-40, 0335-533-40, and 0346-608-40) are in George Armstrong's name; the remaining policy (number 33-5535-B16-40) is in George's name and Addie's name jointly. As the parties agree that if one applies they all apply, this distinction is of no consequence.

>**bodily injury** or **property damage** must be caused by accident arising out of the operation or ownership of the **uninsured motor vehicle**. The **bodily injury** must be sustained by an **insured**.
>
>>[*Bodily Injury*– means bodily injury to a *person* and sickness, disease or death which results from it. (Inserted from definitions section.)]
>
>*Uninsured Motor Vehicle*– means:
>
>>. . . .
>>
>>2.       a "hit-and-run" *motor vehicle* whose owner or operator remains unknown, but only if:
>>
>>>a. the *bodily injury* or *property damage* was caused by physical contact with the unknown vehicle, or the accident was witnessed by someone other than the owner or operator of the insured vehicle. The witness must sign an affidavit attesting to the truth of the facts of the accident contained in the affidavit; and
>>>
>>>b. the *insured* was not negligent in failing to determine the identity of the other vehicle and the driver of the other vehicle at the time of the accident.
>>
>>. . . .
>
>**Who Is an Insured**
>
>>*Insured*– means:
>>
>>>1.       *you, your spouse* and *relatives*;
>>
>>. . . .
>>
>>[*Relative*– means a *person* related to *you* or *your*

>>*spouse* by blood, marriage or adoption who resides primarily with *you*. It includes *your* unmarried and unemancipated child away at school. (Inserted from definitions section.)]

. . . .

**If There Is Other Uninsured Motor Vehicle Coverage**

>1. If:

>>a. *you, your spouse*, or a *relative* sustains *bodily injury* or *property damage* as a pedestrian; and
>>b. coverage from more than one of our policies issued to *you, your spouse* or a *relative* applies to the accident:

>>>(1) the one policy with the highest limit shall apply in that limit; and
>>>(2) each of the other policies we issued shall apply only in an amount equal to the minimum limits required by the *Financial Responsibility Act* for bodily injury and property damage liability.

(Policy at 3-4,18-22; Stipulation at 1-2.)

It is black letter law that "once a contract or agreement is before the court for interpretation, the main concern of the court is to give effect to the intention of the parties." Williams v. Teran, Inc., 221 S.E.2d 526, 528 (S.C. 1976) (citing City of Greenville v. Washington Am. League Baseball Club, 32 S.E.2d 777 (1945)). Germane to the present issue, "Insurance policies are subject to the general rules of contract construction. Courts must enforce, not write, contracts of insurance, and their language must be given its plain, ordinary and popular meaning." Sloan Constr. Co. v. Cent. Nat'l Ins. Co., 236 S.E.2d 818, 819-820 (S.C. 1977) (citing First Nat'l Bank of S.C. v. U.S.F

and G. Co., 373 F. Supp. 235, 239 (D.C. 1974); Blanton v. Nationwide Mut. Ins. Co., 146 S.E.2d 156 (1966)). Furthermore, in the insurance realm, "in cases of doubt, uncertainty, manifest ambiguity or susceptibility of two equally reasonable interpretations since the language used is the selection and arrangement of the insurer, such contracts must be liberally construed in favor of the insured." Charles v. Canal Ins. Co., 121 S.E.2d 200, 205 (S.C. 1961) (citing Parker v. Jefferson Standard Life Ins. Co., 155 S.E. 617 (S.C. 1930); Walker v. Commercial Cas. Ins. Co., 4 S.E.2d 248 (S.C. 1939)). The court finds the Polices to be unambiguous and accordingly interprets them by their plain and ordinary meaning.

### B.     Findings of fact on the narrow issue

Based on the testimony of witnesses, evidence introduced at trial, and the arguments of counsel, the court finds that Rickey Armstrong was a "relative" of both George and Addie Armstrong at the time of his death as that term is defined by the State Farm insurance Policies. The Polices define the term relative as "a *person* related to *you* or *your spouse* by blood, marriage or adoption who resides primarily with *you*." (Policy at 4.) It is undisputed that Rickey is Addie Armstrong's brother.[5] It is further undisputed that Addie and George Armstrong are husband and wife. Accordingly, as the parties have repeatedly stated, the only issue is whether Rickey resided primarily with George and Addie at the time of his death.

It is also undisputed that Rickey's sisters purchased a dilapidated mobile home

---

[5] Addie's maiden name and her husband's surname are both Armstrong, which accounts for her continuing to share Rickey's last name even after her marriage to George.

and placed it on the ground beside George and Addie Armstrong's home so that Rickey could live there.[6]  They furnished it with two beds, two dressers, a table and chairs, a couch, a stove, and a refrigerator.  Rickey kept some of his personal property and important papers in the mobile home and also used the 119 Cookies Place mailing address for official documents such as his driver's license, voter registration, and tax returns.  State Farm argues that Rickey fulfilled his sisters' intentions and actually lived in the mobile home up to the time of his death.  Rickey's estate argues that the mobile home was never fit to live in; therefore, Rickey primarily resided with George and Addie Armstrong.

State Farm first relied on the deposition testimony of Walter Green as evidence to support its argument that Rickey lived in the mobile home at 119 Cookies Place.  Mr. Green testified that he had known Rickey well for twelve years leading up to Rickey's death and that he and Rickey were the best of friends.  (Green Dep. at 8-9, 11.)  He further stated that Rickey was living in the mobile home at 119 Cookies Place just before his death and that Rickey had never lived with George and Addie Armstrong.  (Green Dep. at 12, 16.)  The court does not find Mr. Green's deposition testimony persuasive on the issue of Rickey's primary residence because Mr. Green had never been in the mobile home located at 119 Cookies Place.  (Green Dep. at 14, 18-19.)  Mr. Green did not know that the mobile home had no electricity, running water, or sewer connection.  (Green Dep. at 19.)  In short, Mr. Green did not have any foundation for knowing where Rickey

---

[6] The mobile home was associated with the address 119 Cookies Place while Addie and George Armstrong's house was associated with the address 107 Cookies Place.

7

primarily resided just before his death.

State Farm next relied on the deposition testimony of Jeffrey Armstrong, Rickey's brother. Jeffrey testified that Rickey only spent the night and ate at 107 Cookies Place about once every two weeks. (Jeffrey Armstrong Dep. at 16, 18.) However, when asked directly where Rickey lived, Jeffrey said that Rickey shared a room with him at 107 Cookies Place in the home of George and Addie Armstrong. (Jeffrey Armstrong Dep. at 10.) Jeffrey further stated that he and Rickey never lived in the mobile home next to 107 Cookies Place because it was unfit to live in. (Jeffrey Armstrong Dep. at 12.) He also said that Rickey never spent one night in the mobile home. (Jeffrey Armstrong Dep. at 13.) Jeffrey testified that the mobile home never had electricity, running water, or septic connection. (Jeffrey Armstrong Dep. at 14.) The court finds Jeffrey Armstrong's testimony to support Rickey's estate in its argument that Rickey primarily resided with George and Addie Armstrong at 107 Cookies Place.

State Farm also called George Armstrong as an adverse witness in its case-in-chief. While George testified that Rickey was "back-and-forth" between 107 and 119 Cookies Place, he also testified that Rickey had a bedroom at 107 Cookies Place up until his death. He testified that Rickey kept belongings and clothes in the bedroom and came and went at his leisure. George testified that the mobile home at 119 Cookies Place was not livable, that it had no electricity, no running water, and no sewer or septic tank connection. Though George Armstrong has an indirect financial stake in the outcome of this proceeding through his wife, the court finds that his testimony is credible and that it further supports the position put forward by Rickey's estate.

8

Rickey's estate called two witnesses: Addie Armstrong and Celestine Ann Pringle. Addie testified that she never knew Rickey to spend one night at 119 Cookies Place.[7] She testified that the mobile home never had electricity, running water, or any type of sewage connection and that, as a result, Rickey could not cook, bathe, or use the restroom there. Addie testified that Rickey had too much stuff for his room at 107 Cookies Place so he kept some of it, including his important papers, in the mobile home. She testified that she wanted and intended for the mobile home to be Rickey's house because he had a lot of pride and she felt it would help his self-esteem but that Rickey was never able to make it livable and ultimately lived with her until his death. Although Addie Armstrong stands to gain from the Policies if the court finds for Rickey's estate, her testimony was supported by that of the other witnesses, and the court finds her to be credible.

Rickey's estate called Celestine Pringle as its final witness. Ms. Pringle did not have any knowledge of where Rickey lived but had first-hand knowledge of the condition of the mobile home at 119 Cookies Place. She testified that the mobile home was not habitable and looked as if it should be "condemned." She knew that it had no electricity but was unsure about whether it had running water or sewage connection. Ms. Pringle had nothing to gain or lose from her testimony, and the court finds her to be credible.

---

[7] It was clear that Addie meant Rickey never spent one night in the mobile home that was placed at 119 Cookies Place as everyone agreed that Rickey used to live in a house at that same address until it burned down in 1998.

### C.  Application of the law to the above facts

The plain language of the Policies applied to the facts found above leads the court to find that Rickey Armstrong primarily resided at 107 Cookies Place with his sister and brother-in-law.  Although the Policies do not define the term "primarily", its ordinary meaning is apparent.  Webster's dictionary provides the following two definitions: "1. In the first place.  2. For the most part. "  Webster's II *New Riverside* Dictionary, Office Edition 543 (rev. ed. 1996).  Similarly, "resides" is not defined in the Policies but has a readily ascertainable ordinary and plain meaning: "1. To live in a place: dwell.  2. To be present: inhere."  Id. at 583.  All of the evidence shows that the mobile home at 119 Cookies Place did not have electricity, running water, or sewage connection.  As a result, the stove, refrigerator, and other amenities were of little use to anyone attempting to reside there.  The evidence further shows that the trailer was not habitable and that Rickey Armstrong rarely, if ever, slept there.  In most instances, a person lives where he eats, sleeps, bathes, and goes to the restroom.  The only evidence is that Rickey was no exception to this rule and that he performed these essential tasks at 107 Cookies Place.  In other words, for the most part, Rickey Armstrong lived at 107 Cookies Place; therefore, he primarily resided there for the purposes of the Policies.

The case law that State Farm cites as authority does not persuade the court to reach a contrary conclusion.  The court agrees with the law as stated by plaintiff that "a resident of the same household is one, other than a temporary or transient visitor, who lives together with others in the same house for a period of some duration, although he may not intend to remain there permanently."  Buddin v. Nationwide Mut. Ins. Co., 157

S.E.2d 633, 636 (S.C. 1967).  The court finds that Rickey Armstrong was not a temporary or transient visitor but one who ate, slept, bathed, and otherwise lived with Addie and George Armstrong.  He had a room in their home; he came and went as he pleased.  While he stored possessions in other places, Rickey performed his activities and daily living in 107 Cookies Place.  In addition, the South Carolina Supreme Court reiterated in Buddin that "where [an insurance] clause is one of inclusion it should be broadly construed for the benefit of the insured while in exclusion cases the same clause is given a more restricted interpretation."  Id. at 635 (citing Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co., 146 S.E.2d 410 (N.C. 1966)).  That policy is furthered by the present decision.

      The two South Carolina Court of Appeals cases cited by plaintiff, Richardson v. South Carolina Farm Bureau Mut. Ins. Co., 519 S.E.2d 120 (S.C. Ct. App. 1999), and Auto Owners Ins. Co. v. Langford, 500 S.E.2d 496 (S.C. Ct. App. 1998), are simply factually distinguishable.  The plaintiff in Richardson only visited the residence in question once a month and spent most of her time at various apartments outside of town.  Richardson, 519 S.E.2d at 122.  There was nothing in that case to suggest that the plaintiff depended on the residence in question for life's basic necessities, as Rickey Armstrong did in the present case.  Likewise, in Auto Owners, there was ample evidence to suggest that the party in question did not depend on the insured's residence for life's necessities but instead received them at her mother's address.  Auto Owners, 500 S.E.2d at 498.  It is also important to note that in these two appellate court cases, the trial court made the original finding that the parties were not residents of the respective insured's

11

houses; therefore, the appellate court was obligated to give that finding its due deference. Richardson, 519 S.E.2d at 121; Auto Owners, 500 S.E.2d at 497.  Conversely, in Buddin, the South Carolina Supreme Court reversed a jury verdict to hold that the plaintiff was an additional insured under the pertinent language, illustrating the court's willingness to read an inclusive insurance clause expansively even in the face of a jury finding.  Buddin, 157 S.E.2d at 637.

### III.    Conclusion

In light of the above findings of fact, conclusions of law, and stipulations of the parties, the court finds that Rickey L. Armstrong primarily resided at 107 Cookies Place, was a relative under the pertinent Policies, is consequently an insured under the same Policies, and is therefore eligible to receive up to $95,000.00 in benefits for his survival and wrongful death claims as a result of those Policies and as agreed to by the parties prior to the above determinations.[8]

It is therefore, **ORDERED**, for the foregoing reasons, that plaintiff's request for relief is **DENIED** and judgment should be entered in favor of defendant.

**AND IT IS SO ORDERED**.

_____
**David C. Norton**
**United States District Judge**

**June 23, 2005**
**Charleston, South Carolina**

---

[8] See Compl. at ¶ 6 (explaining that $50,000.00 is available from one policy and $15,000.00 from each of the other three policies); see also Answer at ¶ 5 (admitting the same on information and belief).